### SAMUELS v. E. F. DREW & CO., Inc.

#### Claim of ELDORADO OIL WORKS.

(District Court, S. D. New York.  October 24, 1922.)

Receivers ⬥➾90—Sales ⬥➾384(2)—Appointment terminates contract of sale; measure of damages for breach.

Appointment of receivers for an insolvent corporation, who elect not to adopt a contract by the corporation for purchase of a marketable commodity for delivery in future installments, terminates such contract, and the measure of damages allowable against the receivership estate for the anticipatory breach of the contract is the difference between the contract price and the market price of the commodity at the time the receivers were appointed, for delivery at the times specified in the contract.

In Equity.  Suit by Sumner L. Samuels against E. F. Drew & Co., Inc.  In the matter of the claim of Eldorado Oil Works.  Measure of damages determined.

Lowenthal & Szold, of New York City, for receiver.

MACK, Circuit Judge.  Claimant contracted to sell, and defendant to purchase, Snowflake cocoanut oil under four contracts, made in July and August, 1920, and providing for delivery in October, November, and December, 1920.  All but 20,000 pounds of the October deliveries were accepted.  One car was shipped on November 5th, before the claimant learned of the appointment of the receivers on October 30, 1920.  This shipment, together with the October shipments, had been paid for.  The claim is for damages for failure to take and pay for the remaining oil.

In the course of the administration of the estate, the receivers adopted such contracts as they deemed advantageous, refrained from adopting others deemed not advantageous, and at various times expressly repudiated the latter.  Claimant at no time applied to the court for any order compelling the receivers to elect.  The claimant was in negotiation in reference to the matter during the month of November.  On December 14, 1920, it received the receivers' letter electing not to adopt the contracts.

The contract price under one contract was 12½ cents a pound—under the others 12⅞ cents.  It is not clear from the petition and answer what the market price of these goods for deliveries at the dates specified was on October 30, 1920.  It is conceded that the market price both for immediate delivery and deliveries as specified fell subsequent to that date.  Claimant fixes the amount of its damage at upwards of

---

⬥➾For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

$32,000. While immaterial for the determination of the amount of the claim, it may be noted that claimant has assented to the reorganization.

The real question is that of the measure of damages for the anticipatory breach. The receivers contend that the difference on October 30th between the contract and market price for delivery on the dates fixed by the contract governs. Claimants assert that the difference between the contract and market price on the dates fixed for delivery controls. The parties are agreed that the appointment of the receivers created anticipatory breach of contract, conditional, as receivers contend, on their failure to adopt the contracts, and, as claimants contend, on their renunciation, in each case, within a reasonable time.

Ordinarily, in a personal action for breach of contract of sale, the measure of damages is as claimant contends; but even in such an action, if, on the anticipatory breach, there be a present market price for the goods to be delivered in accordance with the original contract, that price controls, not the market price for immediate delivery either at the time of breach or at the time fixed in the contract for delivery. A ready illustration is a wheat contract, made in December for May delivery, with anticipatory breach in January. The better rule of damages, because of the duty to mitigate damages when reasonably possible, is the difference between the contract price on the one hand, and the market price in January of May wheat, not the price of January cash wheat or of May cash wheat, on the other hand, and this even though action be brought or tried after May. Sedgwick, Damages (9th Ed.) § 636-E.

But we are not here concerned with a personal action; theoretically, at least, that right remained with the vendor on October 30, 1920; indeed, it still remains, even though its prosecution would now be fruitless. We are dealing here with a right in rem—a right to participate in a fund that has come into the control of the court for equitable distribution among creditors. The distinction is important, theoretically and practically. It is neatly illustrated in Hynes v. Illinois Trust & Savings Bank, 226 Ill. 95, 80 N. E. 753, and especially in the old bankruptcy cases cited therein—Ex parte Deey, 2 Cox, 423, and Ex parte Rogers, Buck's Bankruptcy Cas. 490—wherein the claim for participation in equity and in bankruptcy, respectively, of a bona fide purchaser before maturity of commercial paper, was subjected to defenses good against his predecessor in title at the time of the appointment of the receiver and the commission of the act of bankruptcy, respectively, although in each case the claim in personam was concededly free of such defenses.

The equity rule as to the claim for participation that interest ceases on the day of the appointment of the receivers, although in personam it continues at the contract rate (Am. Iron Co. v. Seaboard Air line, 233 U. S. 261, 266, 34 Sup. Ct. 502, 58 L. Ed. 949), and that for dividends all claims are measured as of that date, notwithstanding a realization on collateral thereafter and before the dividend declaration. Merrill v. National Bank, 173 U. S. 131, 19 Sup. Ct. 360, 43 L. Ed. 640, is based upon the same fundamental principle; that is, that equal-

ity of treatment demands that rights of the participants in the fund insufficient to pay all claimants what they could have recovered in personam are to be determined as of the day the fund comes into the control of the court.

This is the principle that I have heretofore applied in this receivership, in determining that the rate of exchange on October 30th shall govern, though the obligations matured thereafter. If the receivers, immediately on their appointment, had expressly renounced the contracts, and so notified claimants, the latter could at once have protected themselves against a possibly falling market by finding another purchaser. Any speculation as to rise or fall should clearly be on claimants' own account.

True, there is some hardship involved in the conditional nature of the implied renunciation; that is, in permitting the receivers to adopt contracts within a reasonable time. During the period of consideration the other party may be helpless to protect himself. But the period can be made extremely short. Application to the court to compel an election can be made at once, or in any event promptly after knowledge of the receivership. In a fluctuating market the court would surely act speedily, and would compel a prompt election by the receivers. Menke v. Willcox (D. C.) 275 Fed. 57.

Viewed from a practical standpoint, a claimant ordinarily would be much more able to gauge market conditions, and to protect himself from further loss during the brief period for the receivers' election, than the receivers would be to protect the other creditors. New York Sale of Goods Act (Consol. Laws, c. 41) § 145, is inapplicable. It regulates the right and the action in personam, not that in rem for participation in an insolvent estate. It is therefore unnecessary to determine its interpretation in reference to anticipatory breaches of such contracts as those in question. While perhaps not binding authorities in the determination of the present claim, reference is here made to Pennsylvania Steel Co. v. New York City Railway, 198 Fed. 721, 746, 117 C. C. A. 503, claim of New York Conduit & Cable Co.; Roehm v. Hoerst, 178 U. S. 1, 20 Sup. Ct. 780, 44 L. Ed. 953; Texas Co. v. International & Great Northern Ry. Co., 250 Fed. 742, 163 C. C. A. 74, certiorari denied Central Trust Co. of New York v. Texas Co., 249 U. S. 613, 39 Sup. Ct. 388, 63 L. Ed. 802.

Unless the parties can agree as to the difference on October 30, 1920, between the contract price and the then market price for similar goods to be delivered at the times specified in the contract, the issues will be referred to a special master for determination of that single fact. The claim will be allowed for such difference, if any, for the entire amount undelivered under the several contracts.